IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

WROCKELLE SHAW                    *
                                  *
        Plaintiff,                *
                                  *
        v.                        *        CV 121-085
                                  *
GEORGIA DEPARTMENT OF             *
BEHAVIORAL HEALTH &               *
DEVELOPMENTAL DISABILITIES and    *
EAST CENTRAL REGIONAL             *
HOSPITAL,                         *
                                  *
        Defendants.               *

                        _____

                    O R D E R

                        _____

    Before the Court is Defendants' motion for summary judgment.
(Doc. 45.)  For the reasons set forth below, Defendants' motion is
**GRANTED.**

## I. BACKGROUND

    This employment discrimination case arises out of Plaintiff
Wrockelle Shaw's employment with East Central Regional Hospital
("ECRH"), which is a hospital under the Georgia Department of
Behavioral Health and Developmental Disabilities ("DBHDD").  (Doc.
51-1, at 1).

    Plaintiff is an African American woman who worked at ECRH
from April 16, 2019 to January 19, 2020 as a Health Services
Technician ("HST").  (Id.)  During her employment with ECRH,

Plaintiff worked under two HST leads ("HST Leads") - Julie Keber, who is white, and Clara Walker, who is African American. (Id. at 2; Doc. 47, at 3, 9.)   HST Leads are responsible for monitoring the unit, directing work, assisting the Unit Manager and Shift Manager with issues, and at times, are assigned their own individuals[1] to care for.  (Doc. 47, at 2; Doc. 52, at 4.)   HST Leads also assist HSTs when needed, ensure the unit runs smoothly, and report any issues to management.  (Doc. 47 at 2-3.)   According to Plaintiff, HST Leads also evaluate HSTs monthly and ensure HSTs comply with applicable policies and procedures.  (Doc. 52, at 3.)   HST Leads do not have hiring or firing authority, nor can they issue disciplinary write-ups, but HST Leads can report issues to higher management.  (Doc. 47, at 3; Id. at 4.)

According to Plaintiff, throughout her employment with ECRH, she was discriminated against based on her race.  (See Doc. 1, at 11-15.)  Plaintiff's primary contentions are that she was assigned additional work that other employees were not required to complete, department policies were disproportionally applied to her, and Ms. Keber refused to assist Plaintiff when she asked for assistance. (See generally Doc. 51-1.)  Below, the Court discusses Plaintiff's various allegations of harrassment.

---

[1] The Parties refer to the patients at ECRH as "individuals," as does the Court.

On July 19, 2019, Plaintiff alleges Ms. Keber made Plaintiff take an individual that was assigned to a different HST to work study. (Id. at 5.) Plaintiff alleges Ms. Keber refused to help Plaintiff with her individuals, first, on September 24, 2019, when Plaintiff asked Ms. Keber for assistance feeding an individual, and again on November 22, 2019, when Plaintiff asked Ms. Keber to bring another individual into the bathroom. (Id. at 6.)

On July 25, 2019, Plaintiff asked Ms. Keber to help her with an individual who needed to use the toilet, and Plaintiff alleges Ms. Keber pushed Plaintiff out of the way with her hips to get to the individual and "threw" the individual onto the toilet. (Id.; Doc. 47, at 4.) Plaintiff alleges she was "totally hurt and shocked" about the incident and reported it to her manager, but never heard back. (Doc. 51-1, at 6.)

Plaintiff alleges three instances of harrassment occurred on November 23, 2019. (See id. at 6-7.) First, Ms. Keber was assigned to one of Plaintiff's individuals for the duration of Plaintiff's lunch and Ms. Keber lost the individual, and when Plaintiff returned from lunch, Ms. Keber told Plaintiff to go look for the individual. (Id.) Second, Ms. Keber told Plaintiff to stand and wait in the hallway while an individual was being fed, which was not a correct practice. (Id. at 7.) Plaintiff alleges Ms. Keber targeted Plaintiff because other employees were not told to wait in the hallway. (Id.) Third, Plaintiff met with Ms. Keber and

3

another HST Lead to discuss the assignment schedule, and according to Plaintiff, the meeting turned hostile. (Id.) Plaintiff claims that Ms. Keber threatened her by "saying she had to leave before she '[did] something' to Plaintiff," and then Ms. Keber left the meeting. (Id.)

On December 7, 2019, Ms. Keber told Plaintiff she was being written up for documenting too early. (Id.; Dep. of Wrockelle Shaw ("Shaw Dep."), Doc. 46-2, at 59.) Plaintiff asked Ms. Keber whether she had checked other HST's documentation for similar issues, to which Ms. Keber did not respond. (Doc. 51-1, at 7.) Plaintiff asked her coworkers if their documentation had been checked, and they said it had not been. (Id. at 8.) A manager was called to the floor, and the manager asked Ms. Keber why she singled out Plaintiff when others were completing their documentation the same way. (Id..) Ultimately, Plaintiff was not written up. (Shaw Dep., at 59.)

On December 20, 2019, Ms. Keber told Plaintiff to go to lunch at 10:30 A.M., "even though [Ms.] Keber knew Plaintiff was having food delivered later in the day and [Ms.] Keber could have assigned another employee to the earlier lunch." (Doc. 51-1, at 8.) Ms. Keber "routinely made Plaintiff go to lunch during an undesirable early lunch shift at 10:30 A.M." (Id.) Plaintiff and Ms. Keber later "had a confrontation about the lunch scheduling," during

which, according to Plaintiff, Ms. Keber "snatched a book out of Plaintiff's hands." (Id.)

On January 4, 2020, Plaintiff was issued a "Written Verbal Counseling" by Ms. Parker because "[Ms.] Keber accused Plaintiff of altering a Staff Assignment Sheet and refusing to go to lunch when scheduled." (Id. at 4.) According to Plaintiff, she did not alter the assignment sheet, her coworker did. (Id.) Plaintiff met with Ms. Keber and another HST Lead about the issue and claims that the meeting "was just very hostile." (Id. at 5.)

According to Defendant, Plaintiff did not receive any formal disciplinary actions during her employment; she was only informally disciplined. (Doc. 47, at 5-6.) Plaintiff disputes this as she received several writeups which were placed in her personnel file. (Doc. 52, at 10.) Plaintiff alleges she was treated differently than her coworkers when it came to these corrective actions. (See Doc. 51, at 4-5.) On August 28, 2019, Plaintiff was issued a Memorandum of Concerns and Expectations by Unit Manager Candace Broadnax for an incident where Plaintiff was accused of leaving an individual unattended on the toilet. (Doc. 47, at 6.) Plaintiff alleges it is a common practice at ECRH to leave individuals unattended, yet she was the only one reprimanded. (Id.; Doc. 51-1, at 3.) On November 14, 2019, Plaintiff was issued a Memorandum of Concerns and Expectations for failing to complete necessary documentation for individuals in her care. (Doc. 47, at

4; Doc. 51-1, at 4.)   Plaintiff admitted she did not complete the documentation but alleges other employees also failed to complete their documentation and were not reprimanded.   (Doc. 47, at 6; Doc. 51-1, at 4; Shaw Dep., at 82-83.)   Defendant investigated, and according to Defendant, other employees found to be out of compliance were also written up.   (Doc. 47, at 6.)   However, according to Plaintiff, not all of the employees who were out of compliance were written up.   (Doc. 52, at 11.)

On September 12, 2019, Plaintiff arrived at work and found an individual assigned to her care bleeding from his head, and she reported this to a nurse.   (Doc. 47, at 4; Doc. 51-1, at 3.)   As a result of the incident, Plaintiff was suspended with pay while the individual's injury was investigated.   (Doc. 47, at 4-5.) After the investigation was complete, Plaintiff was reinstated and she did not lose any benefits because of the suspension, nor did her compensation or duties change.   (Id.; Doc. 52, at 9-10.)   The HST who was assigned to care for the individual overnight was also suspended with pay pending the investigation.[2]   (Doc. 47, at 5.)

Next, Plaintiff claims she was treated unfairly because she was transferred units.   (Doc. 52, at 12-13.)   Plaintiff worked in the "Redbud J-Wing Unit" ("J-Wing Unit") but was transferred to

---

[2] Ms. Keber reported to work before Plaintiff and was involved with individuals before Plaintiff arrived.   (Doc. 51-1, at 3.)   There is some confusion as to whether Ms. Keber was suspended because of the incident.   (See Doc. 51, at 4.) However, as demonstrated below, this fact is immaterial to the Court's resolution of Defendant's motion.   See infra note 8.

the "Redbud D-Wing Unit" ("D-Wing Unit") when the J-Wing Unit closed. (Doc. 51-1, at 9.) All employees working in the J-Wing Unit were reassigned because of its closure, and Ms. Keber was reassigned to "Communion Unit 763," a unit in which most patients could not move around on their own. (Doc. 47, at 7; Doc. 51-1, at 9-10.) The individuals in the D-Wing Unit, where Plaintiff was moved, are aggressive and have behavioral issues. (Doc. 51-1, at 10.) When an employee is transferred, there is no change to the employee's salary, benefits, or responsibilities. (Doc. 47, at 7; Doc. 52, at 13.)

Finally, on January 5, 2020, Plaintiff submitted her resignation after Ms. Keber accused Plaintiff of changing her signature on the assignment sheet. (Doc. 51-1, at 12; Shaw Dep., at 104.) On January 7, 2020, Plaintiff met with Residential Director Leggett to discuss her claims of hostile work environment and harassment, and Plaintiff alleges she told Ms. Leggett that Ms. Keber "was treating [Plaintiff] differently because [Plaintiff is] black and [Ms. Keber] is white." (Doc. 51-1, at 13.) Plaintiff asserts Ms. Leggett did not take Plaintiff's claims seriously, and Plaintiff ultimately resigned on January 19, 2020. (Id. at 13, 16; Doc. 47, at 2.) On several occasions, Plaintiff reported to Defendants her concerns with how she was treated, but according to Plaintiff, her concerns were never addressed. (See Doc. 51-1, at 10-16.) In July 2019, she complained to Defendants that Ms. Keber

was picking on her, in September 2019, she complained to Defendants that she was suspended pending the outcome of an investigation and was told she would have to use her leave for the days she was suspended, in November 2019, she complained to Defendants that she received an unfair writeup from Ms. Keber, in December 2019, she submitted a complaint,[3] and in January 2020, she complained of her treatment after she submitted her resignation notice. (Id. at 10-12; Doc. 47, at 7.)

In her Complaint, Plaintiff asserts she filed an Equal Employment Opportunity Commission ("EEOC") Charge on April 15, 2020 and received a right to sue letter on September 11, 2020.[4] (Doc. 1, at 4.) Plaintiff represents that she received a right to sue letter on September 11, 2020, and she brought this suit on December 10, 2020, alleging racial discrimination in violation of Section 1981 and Title VII. (See id. at 1-2, 4.) Defendants now move for summary judgment on all claims. (See Doc. 46.)

_____

[3] Defendants assert Plaintiff submitted this complaint to Employee Relations Specialist Bridgett McClain about being written up by Ms. Hayes for "failing to complete job duties," while Plaintiff asserts she submitted this complaint to Defendants outlining issues she had with Ms. Keber and Ms. Hayes. (Doc. 47, at 7; Doc. 52, at 13.)

[4] Plaintiff did not attach her EEOC Charge or the right to sue letter to her Complaint. (See Doc. 1.) Nevertheless, she alleges she "satisfied all administrative prerequisites to perfect her claims by timely filing a Charge of Discrimination with the [EEOC] on or about April 15, 2020," and "[a] notice of Right to Sue letter was issued on September 11, 2020, and Plaintiff brings this suit within ninety (90) days of receipt of that notice." (Id. at 4.) Defendants "admit "[P]laintiff filed a Charge of Discrimination with the EEOC on or about April 15, 2020[,] . . . the EEOC issued its Dismissal and Notice of Rights on September 11, 2020, and the [P]laintiff filed the above-captioned action on December 10, 2020." (Doc. 10, at 6.) Therefore, Defendants do not dispute Plaintiff fulfilled the preconditions to suit.

8

## II. LEGAL STANDARDS

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing [substantive] law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation omitted and internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before

the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. Id. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in

the complaint.   See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).   Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk provided Plaintiff appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default.  (Doc. 48.)   Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.   The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. DISCUSSION

The Court addresses each of Defendants' arguments below.

### A. ECRH as a Defendant

Defendants first argue ECRH is not an entity capable of being sued as it is not a separate entity from DBHDD, rather ECRH "is one of five hospital facilities owned and operated by DBHDD." (Doc. 46, at 13.)   Defendants assert DBHDD is an agency of the State of Georgia, designated as such by O.C.G.A. § 37-1-21(a). (Id.; (citing Decl. of Jenelle Leggett ("Leggett Decl."), Doc. 46-1, at 1).)   In response, Plaintiff simply asserts Defendants have not proven that ECRH cannot be sued.  (Doc. 51, at 12.)

"Georgia recognizes only three categories of legal entities: natural persons; artificial persons such as corporations; and 'quasi-artificial persons as the law recognizes as being capable to sue.'" Kemp v. Georgia State Univ. Admissions Off., No. 1:07-CV-0212, 2008 WL 11320077, at *3 (N.D. Ga. July 28, 2008) (citing Lawal v. Fowler, 196 F.App'x 765, 768 (11th Cir. 2006). The Court finds ECRH is not an entity capable of being sued; rather, ECRH is an entity of DBHDD, which is an agency of the State of Georgia, and as such, Plaintiff's suit is effectively against the State of Georgia. See Williamson v. Georgia Dept. of Human Res., 150 F. Supp. 2d 1375, 1377 (S.D. Ga. 2001) (finding that Georgia Regional Hospital is not a legal entity capable of being sued, rather, it is an entity of a state agency, and thus the plaintiff's claim was against the State of Georgia). Because ECRH is not subject to suit, the Court **GRANTS** summary judgment on all claims against it. The Court will address the remaining claims as against DBHDD as the sole defendant and refer to DBHDD as such.

**B. Section 1981 Claim and Eleventh Amendment Immunity**

Next, Defendant moves for summary judgment on Plaintiff's Section 1981 claim because "Section 1981 does not provide a cause of action against state actors such as DBHDD . . . [rather, s]uch claims must be brought pursuant to 42 U.S.C. [Section] 1983." (Doc. 46, at 13) (citations omitted). Defendant argues Plaintiff only brought a Section 1981 claim, not a Section 1983 claim, and,

nevertheless, DBHDD is immune from suit under Eleventh Amendment immunity because it is a state agency. (Id.) In response, Plaintiff concedes "the proper code section . . . should have been [Section] 1983." (Doc. 51, at 13.) However, Plaintiff continues, "because Defendant[] [was] nonetheless put on notice of the claims, Plaintiff's claims under [Section] 1981 should be allowed to proceed as if they were pled under [Section] 1983." (Id.) As for Defendant's immunity defense, Plaintiff argues Defendant's "view of Eleventh Amendment immunity is overbroad" and "[w]hile Defendant[] may be entitled to immunity in some instances, that is not always true." (Doc. 51, at 15 (citing Miller v. Advantage Behav. Health Sys., 146 F. Supp. 3d 1318 3d 1318, 1322-23 (M.D. Ga. 2015).) Because Plaintiff argues its Section 1981 claim should be permitted to proceed as if pled under Section 1983, the Court addresses whether Plaintiff may bring a Section 1983 claim against Defendant.

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "Controlling interpretations of the Eleventh Amendment firmly 'establish that an uncontesting [s]tate is immune from suits brought in federal courts by her own citizens as well as by citizens of another

state.'" <u>Hardy v. Georgia Dep't of Corr.</u>, No. CV 117-172, 2019 WL 4670758, at *4 (S.D. Ga. Sept. 24, 2019)(quoting <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984)). "Eleventh Amendment immunity equally applies to a state's agencies and departments." <u>Id.</u> "The Eleventh Amendment bars Section 1983 suits absent a waiver of immunity or congressional override," neither of which have occurred here. <u>Id.</u> (citing <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 66 (1989). As discussed above, DBHDD is an agency of the State of Georgia. (<u>See</u> Doc. 46, at 13 (citing O.C.G.A. § 37-1-21(a)).) As such, a claim against it under Section 1983 is barred. <u>See Johnson v. Ga. Dep't of Behav. Health & Dev. Disabilities</u>, CV 418-50, 2018 WL 3543844, at *3 (S.D. Ga. July 3, 2018) (<i>adopted by</i> <u>Johnson v. Fitzgerald</u>, CV 418-50, 2018 WL 3543709 (S.D. Ga. July 23, 2018) (dismissing DBHDD from the case because as a state agency, it was immune from suit under the Eleventh Amendment). Because Plaintiff's Section 1981 claim should have been brought under Section 1983, Defendant's motion for summary judgment on Plaintiff's Section 1981 claim is **GRANTED**. The Court will not allow Plaintiff's Section 1981 claim to proceed as if it had been pled under Section 1983 because a Section 1983 claim against Defendant, as a state agency, is barred under the Eleventh Amendment.

## C. Title VII Race Discrimination Claim

Plaintiff brings a claim of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Doc. 1, at 12-13.) Defendant moves for summary judgment on Plaintiff's Title VII race discrimination claim because: (1) Plaintiff cannot establish a prima facie case of discrimination because she was not subjected to an adverse employment action and she cannot point to similarly situated coworkers; and (2) even if she could establish a prima facie case of discrimination, Defendant had legitimate, non-discriminatory reasons for its actions. (Doc. 46, at 15-19.)

Title VII prohibits an employer from discriminating against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may prove discrimination with direct or circumstantial evidence." Nurse v. Rhodes Fin. Serv., Inc., No. CV 117-108, 2019 WL 1114880, at *7 (S.D. Ga. March 11. 2019) (citing Harris v. Shelby Cnty. Bd. of Educ., 99 F.3d 1078, 1082-83 (11th Cir. 1996)). Here, Plaintiff presents no evidence of direct discrimination, so the Court looks to Plaintiff's circumstantial evidence. (See Doc. 51, at 15.)

To succeed on a Title VII claim based on circumstantial evidence, courts apply the burden-shifting framework found in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, the plaintiff must first establish a

prima facie case of discrimination by showing: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside of her class more favorably." Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc). Once the plaintiff has established her prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." Id. at 1221 (citation omitted). If the defendant meets its burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." Id.

First, Defendant argues Plaintiff cannot establish a prima facie case of discrimination because she was not subjected to an adverse employment action. (Doc. 46, at 15-17.) In response, Plaintiff argues she was subjected to the following adverse employment actions: (1) she was suspended with pay in September 2019; (2) she was transferred from the J-Wing unit to the D-Wing unit; and (3) she received three written corrective actions.[5] (Doc. 51, at 16-17).

---

[5] Plaintiff also alleges she suffered an adverse employment action because she was constructively discharged. (Doc. 51, at 17-18.) While the Court agrees that a constructive discharge is an adverse action, as demonstrated below, Plaintiff was not constructively discharged. See Davis v. Legal Serv. Ala., Inc., 19 F.4th 1261, 1267 (11th Cir. 2021) (citation omitted) ("Under Title VII, a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse employment action.").

"Adverse employment actions include 'tangible employment actions,' which are those actions 'that affect continued employment or pay — things like terminations, demotions, suspensions without pay, and pay raises or cuts — as well as other things that are similarly significant standing alone." Davis, 19 F.4th at 1266 (quoting Monaghan v. Worldpay US, Inc., 955 F.3d 855, 860 (11th Cir. 2020) (finding that the plaintiff did not suffer an adverse employment action when he was suspended with pay pending an internal investigation)).   The Court evaluates Plaintiff's September 2019 suspension, her transfer, and the three corrective actions she received to determine whether Plaintiff was subjected to an adverse employment action.

1. September 2019 Suspension

First, in September 2019, Plaintiff was suspended with pay pending an investigation into her actions involving an injury of an individual, but after the investigation, she was reinstated with no change in benefits, compensation, or duties. (Doc. 47, at 4-5; Leggett Decl., at 1-2.)  Defendant argues this suspension was not an adverse employment action because neither Plaintiff's benefits nor her compensation changed.  (Doc. 46, at 16.)  In response, Plaintiff does not present evidence that she did in fact suffer an adverse employment action, instead, she argues there is an issue of fact as to whether Ms. Keber was also suspended in connection with the incident. (Doc. 51, at 16.)  The question of

17

whether Ms. Keber was suspended in connection with the incident is irrelevant to the issue of whether Plaintiff suffered an adverse employment action. Plaintiff must show that she suffered an adverse employment action, and "[a] simple paid suspension is not an adverse employment action." Davis, 19 F.4th at 1267 (11th Cir. 2021). Therefore, her suspension in September 2019 was not an adverse employment action.

2. Transfer

Second, Plaintiff argues her transfer from the J-Wing Unit to the D-Wing Unit after the J-Wing Unit closed was an adverse employment action because the individuals in the D-Wing Unit "were aggressive and had volatile behavior issues," and Ms. Keber was transferred to Communion Unit 763, where individuals are less "aggressive" than the individuals in Plaintiff's new unit. (Doc. 51, at 16.)

"[A] transfer to a different position can be adverse if it involves a reduction in pay, prestige or responsibility." Brown v. Jefferson Cnty. Sheriff's Dept., 806 F. App'x 698, 702 (11th Cir. 2020) (internal quotations and citation omitted). Here, Plaintiff's transfer to the D-Wing Unit was not an adverse employment action. Defendant presented evidence showing there was no difference between individuals in the D-Wing Unit and the J-Wing Unit. (Dep. of DBHDD ("DBHDD Dep."), Doc. 46-3, at 161) ("[T]here was really no real difference in the individual[s]" on the D-Wing

and the J-wing.)   Plaintiff herself concedes this fact and states she "was transferred to D-Wing [Unit], a unit with residents like those on J-Wing [Unit] who were aggressive and had volatile behavioral issues." (Doc. 51, at 16.)   Furthermore, Plaintiff was transferred because the J-Wing Unit closed, and Defendant presented evidence that when an employee is transferred, "nothing changes for them . . . [n]ot their tenure, not the salary, not the benefits, not their responsibilities." (DBHDD Dep., at 197; Doc. 52, at 12.)   According to Defendant, [e]verything stays the same [because] [i]t's just strictly a reassignment of location." (Id.) Thus, Plaintiff's transfer to the D-Wing Unit was not an adverse employment action because she suffered no reduction in pay, prestige, or responsibility as a result.   See Brown, 806 F. App'x at 702.

### 3. Written Corrective Actions

Third, Plaintiff alleges she suffered an adverse employment action because she received three written disciplinary actions, including two Memoranda of Concerns and Expectations and one Written Verbal Counseling.  (Doc. 51, at 17; Doc.  51-1, at 3-4.) Defendant argues these are not adverse employment actions.  (Doc. 46, at 16.)   In support of its argument, Defendant presents evidence that the warnings Plaintiff received were not formal disciplinary actions; rather, they were informal actions that did not result in "any termination, demotion, suspension, reduction in

pay, or change in job duties." (Id.; Decl. of Bridgett McClain, Doc. 46-4, at 2.)   Plaintiff responds by arguing that "[i]n reality, the write-ups go in employee files and therefore must in some way influence promotion, rehire, and other employment decisions." (Doc. 51, at 17.)   Plaintiff provides no support for her statement that the informal corrective actions like the ones she received affect employment decisions — her statement appears entirely speculative.   A speculative statement cannot serve as the basis for an adverse employment action.   See Filius v. Potter, 176 F.App'x. 8, 10 (11th Cir. 2006) (internal quotations and citation omitted) (stating that the asserted impact of an adverse employment action "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment").   Therefore, the written corrective actions Plaintiff received are not adverse employment actions.   As such, the Court finds there is no evidence to create a genuine issue of material fact of whether Plaintiff suffered an adverse employment action, and therefore, Plaintiff cannot establish a prima facie case of discrimination under Title VII.   The Court need not evaluate Defendant's remaining arguments. Defendant is entitled to summary judgment on Plaintiff's Title VII race discrimination claim.[6]

---

[6] In her Complaint, Plaintiff alleges "Plaintiff's race was a motivating factor in the . . . discriminatory actions, even if race was not the only factor that motivated those decisions." (Doc. 1, at 13.)   However, Defendant's motion and Plaintiff's response only reference the McDonnell Douglas framework, so the Court only evaluates the claims as such.   See Case v. Eslinger, 555 F.3d 1317,

**D.  Hostile  Work  Environment  and  Constructive  Discharge  in Violation of Title VII**

Lastly,  Plaintiff  alleges  she  was  subjected  to  a  hostile  work environment  that  led  to  her  constructive  discharge.  (See Doc.  1, at 14-15.)  Defendant  moves  for  summary  judgment  on  this  claim. (Doc. 46, at 19.)

Here,  Plaintiff  brings  a  claim  of  constructive  discharge based  on  a  hostile  work  environment.  (Doc.  1,  at  14-15.)  "The 'creation  of  the  hostile  work  environment  is  a  necessary  predicate to  [Plaintiff's]  hostile-environment  constructive  discharge case,'"  so  the  Court  first  addresses  whether  Plaintiff  has established  a  hostile  work  environment  claim  based  on  her  race. Harper v. ULTA Salon Cosmetics & Fragrance, Inc., No. 1:05-cv-1285, 2007 WL 528088, *25 (N.D. Ga. Feb. 13, 2007) (quoting Pa. State Police v. Suders, 542 U.S. 129, 149 (2004)) (alterations adopted).

"A hostile work environment claim under Title VII requires an employee to show harrassment 'sufficiently severe or pervasive to alter  the  conditions  of  [her]  employment.'"  Nurse,  2019  WL 1114880,  at  *5  (quoting  Harris v. Forklift Sys., Inc.,  510  U.S.

---

1329 (11th Cir. 2009) ("When a party moves for final, not partial, summary judgment, . . . it [becomes] incumbent upon the [nonmovant] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in [the moving party's] favor." (internal quotations and citation omitted).)

17, 21 (1993)).   To prevail on a hostile work environment claim, the employee must prove the following:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee . . . (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious liability or of direct liability.

Id. (quoting Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009)).

When evaluating a hostile work environment claim, the Court only considers actions that Plaintiff proves were motivated by discrimination against her protected characteristic.   See id. ("[T]hese [] allegations should not be considered in Plaintiff's hostile work environment claim because these actions were not motivated by discrimination against a protected characteristic." (citation omitted)).   "Disrespectful, unprofessional, and harassing conduct will not suffice to show a hostile work environment unless a link between that conduct and Plaintiff's status in a protected category can be shown." Graham v. Mem'l Health Univ. Med. Ctr., No. CV411-316, 2013 WL 5444733, at *5 (S.D. Ga. Sept. 30, 2013) (citing Turner v. Ga. Sec'y of State, 848 F. Supp. 2d 1361, 1381 (M.D. Ga. 2012)).   Here, Plaintiff's hostile work environment claim fails because she has not shown any of the conduct she complains of was motivated by her race.

Plaintiff does not allege any instances where comments were made about Plaintiff's race. Ms. Keber never used profanity toward Plaintiff and Plaintiff could not recall if Ms. Keber ever used a racial slur towards her. (Doc. 52, at 15-16; Shaw Dep., at 103.) While Plaintiff asserts Ms. Keber treated her white coworkers more favorably than she treated Plaintiff, Plaintiff admitted she "[didn't] know if it's because of my race, my color, or what . . . ." (Shaw Dep., at 54.) Plaintiff argues there were several times Ms. Keber failed to assist her with her individuals; however, the record reveals Ms. Keber did assist Plaintiff at times, and when Ms. Keber was not available to assist Plaintiff, Plaintiff received assistance from others. (Id. at 37; Doc. 52, at 7.) Moreover, Plaintiff argues Ms. Keber "favored other workers over Plaintiff," but states Ms. Keber's favoritism was towards Ms. Freeman and Ms. Williams, two African American women.[7] (Doc. 51, at 20; Shaw Dep., at 96-97.) Ms. Keber's treatment towards Plaintiff cannot be said to be based on Plaintiff's race when Ms. Keber assists Ms. Freeman and Ms. Williams, who are African American, with their individuals instead of Plaintiff. (See Shaw Dep., at 36-37, 105.) To establish a hostile work environment

---

[7] Plaintiff also generally asserts that her white coworkers, including a man named Tony, were treated more favorably by Ms. Keber than Plaintiff was. (Doc. 52, at 14.) However, in her deposition, Plaintiff states Tony "noticed how she was treating me differently from the way she was treating [Ms.] Williams and [Ms.] Freeman." (Shaw Dep., at 101.) As such, Plaintiff's allegations of favoritism appear to primarily deal with Ms. Williams and Ms. Freeman.

claim, Plaintiff must link her treatment to her race, which she has not done — Ms. Keber's favoritism towards other employees may be unfair to Plaintiff, but it is not discriminatory.

Similarly, Plaintiff's treatment resulting from the November 23, 2019, incident involving the lost individual cannot be said to have been motivated by her race.  (See Doc. 51-1, at 6-7.)  Ms. Keber told Plaintiff to go look for the individual Ms. Keber had lost, but Plaintiff was ultimately assigned to care for the lost individual, not Ms. Keber, who was only watching the individual while Plaintiff was at lunch.  (Shaw Dep., at 51-52.)  There are no allegations this assignment was due to Plaintiff's race.

As for the incident involving the individual bleeding from the head that resulted in Plaintiff's suspension, the record reveals Plaintiff was suspended because she was assigned to care for the individual the morning the individual was discovered, and that Ms. Keber, whether suspended or not,[8] was not assigned to the individual.  (Id. at 44-45; Doc. 47, at 5.)

Furthermore, there is no evidence in the record to suggest the two instances where Ms. Keber allegedly subjected Plaintiff to violent behavior were racially motivated.  (Shaw Dep., at 43-44,

---

[8] Plaintiff argues there is a dispute of material fact as to whether Ms. Keber was suspended for this incident such that summary judgment is precluded.  (Doc. 51-1, at 4; Doc. 52, at 8.)   The Court disagrees.  Even if Ms. Keber was not suspended for this incident, such difference in treatment is attributable to the fact that Plaintiff was assigned to care for the injured individual, while Ms. Keber was not — this is irrespective of Plaintiff's race.  (Doc. 47, at 5; Doc. 56, at 8-9.)

55.)  As for the July 2019 incident where Ms. Keber allegedly pushed Plaintiff with her hip, Plaintiff concedes Ms. Keber's actions were because Ms. Keber did not want to assist Plaintiff. (Id. at 43.)  As for the November 2019 incident, where Plaintiff alleges Ms. Keber told Plaintiff she had to leave the room before she "did something" to Plaintiff, there is no indication that this was due to any racial animus.  (See Doc. 51, at 20.)

Plaintiff claims she was written up for failing to complete documentation while other employees were not written up for similar infractions; however, Plaintiff admitted she did not complete her documentation, and when Plaintiff complained of the unfair treatment, Defendant investigated and wrote up at least some of the other employees out of compliance.  (Doc. 51, at 21; Shaw Dep., at 82-83; DBHDD Dep., at 136-137.)  Again, there is no evidence race was the reasoning for Plaintiff's write up; rather, Plaintiff was written up for failing to complete her documentation, which she admitted she did not do.  (See Shaw Dep., at 81; DBHDD Dep., at 136-137.)

As to Plaintiff's remaining allegations of unfair treatment, there is no indication at all that any of these incidents were related to her race.  While the conduct Plaintiff complains of may be inappropriate workplace conduct, it will not be considered in a hostile work environment claim unless a "link between [the] conduct and Plaintiff's status in a protected category can be

shown." Graham, 2013 WL 5444733, at *5 (citation omitted).  Here, as discussed above, there is no such connection.  Because Plaintiff has not established a hostile work environment, she cannot establish a claim for constructive discharge.  See Harper, 2007 WL 528088, at *25.  Therefore, Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim.  Defendant's motion as to Plaintiff's constructive discharge claim is **GRANTED.**

### IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (Doc. 45) is **GRANTED.**  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendants, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 22nd day of March, 2023.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA